Filed 4/21/26  In re J.G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.G.,<br><br>        Defendant and Appellant. | A173871<br><br>(Contra Costa County<br>Super. Ct. No. J2500078) |

J.G. pleaded no contest to robbery, conspiracy to commit robbery, and assault, and the juvenile court committed him to a secure youth treatment facility (Welf. & Inst. Code, § 875)[1] for a baseline term of four years.  J.G. claims the court abused its discretion because the record lacks substantial evidence demonstrating that a less restrictive alternative disposition was unsuitable.  We affirm.

---

        [1] Undesignated statutory references are to the Welfare and Institutions Code.

1

# I. BACKGROUND[2]

## A. *Underlying Offenses and Plea*

J.G. was accused of perpetrating a series of similar crimes over three months in 2024. According to probation's disposition report, in July 2024, J.G. and associates stole multiple vehicles. He and others used those vehicles to commit an armed robbery the next day. The day after that, J.G. and others used the stolen cars to attempt to steal another vehicle, committed another armed robbery, and evaded police in one of the stolen vehicles. In August 2024, J.G. and others stole another car, used it to attempt a robbery, and then completed a robbery. And in September 2024, J.G. and a group again stole a car and, as one of them wielded a firearm, robbed two victims of their jewelry and wallets. Later the same day, the group robbed two more victims of their property. The following day, J.G. and associates used the same stolen car to commit another armed robbery.

In early 2025, a warrant based on these allegations was issued and J.G. was detained at juvenile hall. The District Attorney filed a wardship petition (§ 602) alleging J.G. committed conspiracy to commit robbery (Pen. Code, § 182, subd. (a)(1)); four counts of driving or taking a vehicle without consent (Veh. Code § 10851, subd. (a)) and one count of attempting the same; five counts of second degree robbery (Pen. Code, § 211)—four with a firearm enhancement (Pen. Code, § 12022, subd. (a)(1))—plus one count of attempted second degree robbery; and one count of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)). J.G. pleaded no contest to conspiracy to commit robbery, one count of second degree robbery with a

---

[2] Like the parties, we take the facts of J.G.'s underlying offenses and conduct in juvenile hall from probation's disposition report, which took facts concerning the underlying offenses from several police reports. The parties stipulated that police reports provided a factual basis for J.G.'s plea.

firearm enhancement, and the assault charge.  The juvenile court dismissed the remaining counts with a "*Harvey* waiver"[3] and declared J.G. a ward of the court.

## B.    *Disposition Recommendation*

Probation's disposition report explained that the detective who investigated J.G.'s crimes concluded they were part of a series of similar offenses perpetrated "by closely aligned gang members and their associates," which had included "at least 12 robberies."  "The suspects often targeted vulnerable elderly females" and "pointed guns at the victims to instill fear."  "All of the [12] known suspects," including J.G., "participated in some part of the robbery series, but not all suspects participated in every robbery."

Probation prepared a social study and case assessment, which reflected that J.G. had no previous history with the juvenile justice system.  Before he was detained, J.G. had a 1.29 grade point average in high school, with "86 tardies, 132 truancies, and one suspension" due to involvement in a fight.  In juvenile hall, J.G. had a grade point average of 2.04 and received five As in his courses.  He was on "Gold status" for four weeks, he "served as a unit worker for two weeks," and staff reported he was "respectful and generally adhere[d] to the unit rules."  However, a few months after his detention, J.G. was involved in a fight after staff overheard him speaking through a vent with another youth alleged to be "co-responsible" for his underlying offenses.

---

[3]  *People v. Harvey* (1979) 25 Cal.3d 754.  The term "*Harvey* waiver" refers to the young person's agreement that the juvenile court "may consider facts behind dismissed or uncharged counts."  (*In re Josh W.* (1997) 55 Cal.App.4th 1, 4, fn. 2.)  Here, the juvenile court appears to have referenced the waiver in connection with J.G.'s agreement to be "on the hook" "for paying any restitution for any of [the] dismissed counts."

J.G. acknowledged smoking marijuana every other day but denied any other drug or alcohol use. He denied being involved with gangs or having friends with gang associations and reported a close relationship with his mother and a good bond with his father, who lives in another state. J.G.'s mother described him as "a 'good kid' who is very loving." She portrayed their relationship as " 'pretty close' since they do many things together [and] have good conversations," and she felt J.G. was "open with her." She acknowledged that J.G. would fail to check in about his whereabouts on occasion, " 'slacked' in his studies and ha[d] missed a lot of school," but "noted that sports [we]re important to him," and he was working to improve his grades "to remain on the football and basketball teams." She felt some of his friends were "bad influences" but did not suspect J.G. or his friends had gang affiliations. J.G.'s mother conveyed that she was in the process of moving to another city, "as she realized it was necessary to change their environment."

Both J.G.'s mother and his father "expressed complete shock upon learning of [J.G.]'s charges." J.G.'s father believed that J.G.'s mother worked a lot and had "become more lenient with [J.G.] than she used to be" after suffering a brutal assault by an ex-boyfriend and " 'going through a lot.' " A clinician reported her belief that J.G. could benefit from individual and family therapy and substance abuse counseling. Using a validated evidence-based risk assessment system, probation determined that J.G. was at moderate risk for re-offending.

J.G. was assessed for the "Community Success Pathway" program. He was deemed eligible but unsuitable for that program considering his "poor school attendance, poor grades and disciplinary record, negative peer influences, and admitted marijuana use," along with the "violent nature of the offenses" he perpetrated. "Given these concerning factors," probation

4

concluded that J.G. "would benefit more from a secure environment offering rehabilitative services."

J.G. was also assessed and found eligible for both the "Commitment Pathway" and "Secure Pathway" at Briones Youth Academy. Again, "given the severity of all the circumstances in the offenses," including what probation characterized as a "clear necessity of a high level of intervention," J.G. "was found suitable for [the] Secure Pathway." The report explained that "[a]lthough these are [J.G.]'s first sustained offenses, and [he] appears to have some familial support, as well as involvement in pro-social activities," his offenses "took both planning, and a lot of antisocial associations to execute due to the[ir] complexity." Probation was "highly concerned about [J.G.]'s negative associations" and concluded that his offenses "seem[ed] to be influenced by individuals aligned with street gangs," in particular, a self-admitted gang member who apparently "led" J.G.

Because J.G. was 17 years old "and almost the age of majority," probation concluded that he must be "provided with a highly robust individualized rehabilitation plan" so he "can re-enter the community safely and productively, which cannot be provided suitably with lower levels of intervention." The Secure Pathway would provide J.G. "with an opportunity to participate in intensive programming, such as Trauma Recovery with Behavioral Health, an Anger Control Curriculum, Interactive Journaling, CORE evidenced-based Groups, Life Skills, Cognitive Behavioral Change treatment, should he qualify through assessment, and Victim Empathy," as well as "Multi-Craft Core Curriculum" and college courses, and would afford him "a higher dosage of treatment than a lower level of intervention would provide." It was "crucial" for J.G. "to be held accountable for his actions and receive appropriate counseling to address his individual needs," including

5

"individual therapy, substance abuse counseling, developing positive decision-making skills, . . . distancing himself from negative influences, including gangs[,] . . . refrain[ing] from continued substance use and learn[ing] . . . skills to maintain sobriety," and "attend[ing] school daily." The Secure Pathway would provide J.G. with academic assistance, would "hold [him] accountable for his behavior, protect him as well as the community, and provide him with rehabilitative services while ensuring daily supervision."

## C.    *Disposition Hearing*

At the disposition hearing, a probation officer reiterated that, based on the "extremely troubling" nature of J.G.'s offenses, probation believed he required "significant intervention regarding rehabilitation in the secure setting" and recommended placement in the Secure Track, which would "allow for [an] individualized rehabilitation plan to be developed." J.G.'s counsel requested that he instead be placed on "the Commitment Pathway Program, which is 10 to 12 months." Among other arguments, she emphasized that J.G. was led in the underlying offenses by an "adult ringleader" and had been accused of no previous offenses. J.G.'s counsel submitted a separate social history report and several character references to show that J.G. was "very well loved by his family and also by his community" and could succeed on the Commitment Pathway.

The juvenile court briefly continued the hearing so it could consider additional information about whether J.G.'s offenses were gang-related. When the hearing resumed, a probation officer reported that J.G. had been in another fight at juvenile hall. The court admitted several photographs showing J.G. with alleged "co-responsible" participants in the underlying robberies and others that the prosecutor characterized as "known gang member[s]."

6

The juvenile court expressed that "the entire picture" it had received of J.G. was "very concerning," noting that J.G. was almost 18 years old, and "as we all know, they don't mess around in adult court," so it was "very important to this Court that we get [J.G.] on a different path." The court stated that J.G. had perpetrated a series of "sophisticated" and "violent" offenses, and that before his detention, "something was going wrong where he wasn't going to school" and was "hanging out with gang members." The court emphasized that the photographs it had reviewed showed J.G. not only "hanging out with known gang members" but "himself showing gang signs," in one case while posing next to individuals "holding up a bunch of money and what appears to be a firearm being pointed at the camera."

Following these observations, the juvenile court adopted probation's recommendations. The court explained that "it does appear that the Secure Youth Treatment Program will be able to meet [J.G.'s] needs, and that he actually is amenable or open to receiving guidance and treatment through that program." The court "also considered whether the goals of rehabilitation and community safety can be met by assigning [J.G.] to an alternative, less restrictive disposition," but did not "think there's a less restrictive alternative, given the serious nature of the conduct that he engaged in repeatedly . . . to ensure not only that he get on a better path, but that the public is safe." The court ordered a baseline commitment of four years and a maximum period of confinement of six years and directed J.G. to abide by "gang terms" on probation. It ordered an individual rehabilitation plan and set a six-month progress review hearing.

## II.  DISCUSSION

### A.    *Governing Legal Principles and Standard of Review*

A juvenile court may remove a minor from his or her parents' custody "when necessary for his or her welfare or for the safety and protection of the public."  (§ 202, subd. (a).)  Delinquent minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances," which "may include punishment that is consistent with the rehabilitative objectives" of the statute.  (*Id.*, subd. (b).)

Previously, the Division of Juvenile Justice was "the state's most restrictive placement for its most severe juvenile offenders."  (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902 (*Miguel C.*).)  In 2020, " '[t]o ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment' " (*id.* at p. 907), the Legislature enacted Senate Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337), which required the closure of the Division of Juvenile Justice and the transfer of its responsibilities to county governments (§ 736.5, subds. (a), (e)).  While these reforms did not change section 202, "which recognizes punishment as a potential rehabilitative tool, the new scheme implicitly places less weight on punishment by prioritizing treatment and restricting commitment avenues." (*Miguel C.*, at p. 907.)

The Legislature subsequently enacted section 875 (Stats. 2021, ch. 18, § 12), which now "governs the commitment of juvenile wards to the secure youth treatment facilities that have replaced the Division of Juvenile Justice . . . as the most restrictive placement."  (*In re Tony R.* (2023) 98 Cal.App.5th 395, 406.)  Such placement is authorized only if, among other findings, "[t]he

8

court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(3).) The court must consider "all relevant and material evidence, including the recommendations of counsel [and] the probation department" and must base its determination on "all" of specified criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated . . . . [¶] (B) The ward's previous delinquent history . . . . [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age," other characteristics, "and any disabilities or special needs affecting the safety or suitability of" confining him or her "in a secure youth treatment facility." (*Id.*, subd. (a)(3).) A decision to commit a minor to such a facility must be supported by evidence of probable benefit to the minor and evidence that less restrictive alternatives would be ineffective or inappropriate. (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 6 (*Carlos J.*) [such evidence was required to support the most restrictive placement even before section 875 was enacted].)

We review the juvenile court's placement decision for abuse of discretion, which occurs when critical factual determinations are unsupported by substantial evidence. (*Miguel C., supra*, 69 Cal.App.5th at p. 908.) We draw all reasonable inferences to support the court's decision. (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080.)

"[T]he minimum required substantial evidence of probable benefit" is merely the identification of programs at the secure facility likely to benefit the minor, "includ[ing] *brief* descriptions" of those relevant to any "particular

9

needs." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 12.)  There must also be " 'evidence in the record to show a consideration of less restrictive placements was before the court.' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159 (*Nicole H.*), quoting *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 577 (*Teofilio A.*).)  Where this minimally adequate evidence is present, " 'the fact the judge does not state on the record his consideration of those alternatives and reasons for rejecting them will not result in a reversal.' " (*Nicole H.*, *supra,* at p. 1159, quoting *Teofilio A.*, *supra*, at p. 577.)  Still, " 'there must be some evidence to support the judge's implied determination that he sub silentio considered and rejected reasonable alternative dispositions.' " (*Nicole H.*, *supra,* at p. 1159, quoting *Teofilio A.*, *supra*, at p. 577.)

**B.    *Analysis***

Our record includes the necessary identification of Secure Pathway programming likely to benefit J.G.—which he does not dispute—and reflects that the juvenile court considered and rejected two less restrictive alternative placements: the Community Success Pathway and the Commitment Pathway.  The court explained it had "considered whether the goals of rehabilitation and community safety can be met by assigning [J.G.] to an alternative, less restrictive disposition available to the Court."  But J.G.'s repeated engagement in robberies, stealing cars, not attending school, and using and selling marijuana, among other factors, led the court to view less restrictive alternatives as "unsuitable" and unable "to ensure not only that [J.G.] get on a better path, but that the public is safe."

Probation's disposition report explained that the Secure Pathway would provide "a higher dosage of treatment" than alternatives and J.G.'s counsel confirmed that the Commitment Pathway was of shorter duration.  The juvenile court emphasized its view that J.G. was "gang-entrenched," and was

10

clear that it was motivated by the need for J.G. to "stay[] away from gang members" and also by his need for treatment and therapy "to figure out why he was associating with the gang, why he chose to do those things with the gang, and how we avoid him associating with those gang members and falling into that path of life" upon release from custody. From this explanation, coupled with the court's ruling that a baseline term of four years was needed to achieve J.G.'s rehabilitation, we infer the court determined that a longer stay in a secure facility was necessary to promote both J.G.'s welfare and public safety as compared to the alternative placements. In the context of the whole record before us, we find no abuse of discretion in this conclusion.

## III. DISPOSITION

The juvenile court's dispositional order is affirmed.

_____

SMILEY, J.

WE CONCUR:


_____

HUMES, P. J.


_____

LANGHORNE WILSON, J.


*In re J.G.* / (A173871)